379 So.2d 1336 (1979)
STATE of Louisiana
v.
Elmo Patrick SONNIER.
No. 63293.
Supreme Court of Louisiana.
June 25, 1979.
Opinion Concurring in Part, Dissenting in Part July 6, 1979.
On Rehearing January 28, 1980.
Rehearing Denied March 3, 1980.
*1342 Allen A. McElroy, Jr., McElroy & Ramsey, Ltd., Berwick, Steven P. Shea, New Iberia, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Knowles M. Tucker, Dist. Atty., Dracos D. Burke, Asst. Dist. Atty., for plaintiff-appellee.
BLANCHE, Justice.
Defendant, Elmo Patrick Sonnier, was indicted by grand jury for two counts of first degree murder in violation of LSA-R.S. 14:30. Trial was held on April 12-14, 1978. Defendant was found guilty on each count by a twelve-person jury. Following the sentencing portion of the trial, the jury recommended that the defendant be sentenced to death on each count. The defense requested that the jury be polled, both as to the verdict and the sentence. The trial court was satisfied that the jury had unanimously reached its conclusions. On April 25, 1978, defendant was sentenced to death on each count of first degree murder.
Defendant assigns thirteen errors as the basis for his appeal before this Court. Assignment No. 13 contains four assignments relating to the sentencing proceedings. Finding no reversible error in either the guilt or sentence portion of the trial, we affirm both the conviction and the sentence.

FACTS
On the evening of November 4, 1977, David LeBlanc, age sixteen, and Loretta Ann Bourque, age eighteen, attended a high school football game. Later that evening, the couple parked in a remote area of St. Martin Parish. At approximately one o'clock A.M., defendant and his brother, Eddie James Sonnier, who were rabbit hunting together, came across the couple's car. Using a badge one of the brothers had obtained while working as a security guard and armed with 22-caliber rifles, the two posed as police officers and approached and entered the car. The victims were informed that they were trespassing and that they would have to be brought to the landowner to determine if the landowner desired to press charges. At this time the driver's licenses of both victims were confiscated. The two victims were then handcuffed and placed in the back seat of their (the victims') car. Leaving their own car behind, the defendant and his brother drove the couple twenty-one miles to a remote oilfield located in Iberia Parish, an area known to the defendant.
Once at the oilfield, both victims were removed from the car. David LeBlanc was taken into the woods and handcuffed to a tree. Loretta Bourque was taken a short distance away and raped by the defendant, Elmo Sonnier. She then agreed to have intercourse with Eddie Sonnier in exchange for the couple's safe release. Upon completion of the rapes, the two youngsters were unhandcuffed and brought back toward the road where the car was parked.
At that point, Elmo Sonnier told his brother they could not let the couple go because if the youngsters talked, it would mean he (Elmo) would have to go back to Angola. David LeBlanc and Loretta Bourque were then forced to lie side by side, face down, and were each shot three times at close range in the back of the head. Eddie Sonnier testified that he held a flashlight while the defendant shot the youngsters with a 22-caliber rifle. He further related that Bourque began to cry when the defendant fired a first shot at her which missed. The defendant then fired a second shot which succeeded in striking Bourque in the back of the head. The third shot likewise struck LeBlanc in the back of the head. Each victim was then shot two additional times. At the trial, expert testimony indicated that any one of the shots would have resulted in instantaneous death to the victims.
*1343 The defendant and his brother then drove the victims' vehicle back to the original site where the couple was first accosted in order to pick up their own car. Finding their car with a flat tire, they used a jack from the LeBlanc vehicle to make the change. The jack was later seized by police from the trunk of the defendant's car. The brothers then destroyed the victims' driver's licenses and the following day buried the rifles in another remote area. Investigation also revealed that thirty or forty dollars which was in the possession of the victims prior to the abduction could not be accounted for.
The defendant was arrested on December 5, 1977. He was advised of his rights and taken to the Sheriff's Office in New Iberia. While there, he made a free and voluntary confession which was transcribed by one of the police officers who was present. The statement was then read and signed by the defendant. The defendant was then routinely transferred to a parish prison in an adjacent parish. While enroute, he made another statement to the officers who were transporting him. The following day he made a third confession which was taped. All three statements indicated that the defendant had participated in the abduction of the victims and had shot them.
The police later recovered the two rifles which belonged to the defendant and his brother. Ballistics tests indicated that one of the bullets taken from one of the victim's head and four brass casings found by the police at the scene of the crime had positively been fired from the rifle which belonged to the defendant. Because of excessive damage, the other five bullets that were recovered could only be identified as having been fired from the same model, brand and caliber rifle as that belonging to the defendant.
The handcuffs used in the abduction were later recovered from Elmo Sonnier's bedroom. The State also produced a witness who testified that he had seen the defendants' blue 1961 Dart at the place where the abduction occurred during the early morning hours of November 5, 1977.
The defendant and his brother were jointly indicted on two counts of first degree murder by the grand jury of Iberia Parish. On January 19, 1978, the defendant was arraigned and pled not guilty and not guilty by reason of insanity. A sanity commission was appointed and on March 31, 1978, a sanity hearing was held at which defendant was determined to have the mental ability to assist counsel and understand the nature of the proceedings against him. The State announced on this same date its intention to try the defendant separately and further that it would file a severed indictment pursuant thereto.
On April 3, 1978, a hearing was held on a motion for change of venue. The motion was denied the following day. On April 6, 1978, a hearing was held in which the following motions were denied: (1) to sever, (2) to suppress evidence seized from a search of defendant's home, (3) to set aside the trial date, and (4) for additional mental examination of defendant. On the morning of trial the defendant changed his plea to not guilty.
We deem that the best method to analyze the defendant's appeal is to divide our analysis in the same manner in which the trial was divided: guilt portion and sentencing portion.

GUILT

Assignment Nos. 1 & 3
Defendant claims the trial judge erred in refusing to grant a change of venue. He also argues that during the hearing on the motion for change of venue the trial judge erred in asking various questions of potential jurors during a "dry run" venire.
LSA-C.Cr.P. art. 622 provides:
"A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.

*1344 "In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial."
This Court has consistently held that to warrant a change of venue the burden is on the accused to establish that he cannot obtain a fair trial in the parish where the prosecution is pending. Article 622 requires a showing of more than mere knowledge by the public of facts surrounding the offense. It requires, in addition, proof of such prejudice in the public mind that a fair and impartial trial cannot be obtained in the parish. State v. Sheppard, 350 So.2d 615 (La.1977); State v. de la Beckwith, 344 So.2d 360 (La.1977); State v. Berry, 329 So.2d 728 (La.1976); State v. Stewart, 325 So.2d 819 (La.1976). The granting or denial of the motion for change of venue rests within the sound discretion of the trial judge, and his ruling denying the motion will not be disturbed unless the evidence affirmatively shows that the ruling was erroneous and an abuse of judicial discretion. State v. Sheppard, supra; State v. de la Beckwith, supra; State v. Bennett, 341 So.2d 847 (La.1976); State v. Stewart, supra.
In State v. Bell, 315 So.2d 307 (La.1975), we noted:
"... The defendants were entitled to a change of venue if they could show, even though it would be possible to select a jury whose members were not subject to a challenge for cause, that there were influences in the community which would affect the answers of jurors on the voir dire, or the testimony of witnesses at the trial, or that, for any other reason, a fair and impartial trial could not be obtained in the parish ..." (State v. Bell at 313)[1]
Considering the evidence presented in support of the motion for a change of venue, we are confident that there was no abuse of discretion in denying the motion.
The defense claims that prejudice existed in the community and undue influence would be exerted on potential jurors such that a fair trial could not be obtained in Iberia Parish. In support of this, the defendant points to three separate factors as requiring a change of venue.
First, the defense claims that after the defendant was arrested and booked into the Iberia Parish Prison he was transferred to another prison in another parish because authorities feared for the safety of the defendant if he remained in New Iberia. The defense argues that this fear was based upon a public outcry in the community against the defendant. Second, counsel for the defense claims that pre-trial publicity was so extensive and so inflammatory that it was impossible for the defendant to receive a fair trial in Iberia Parish. Finally, the defendant claims that the "dry run" voir dire clearly established that prospective jurors were either prejudiced or influenced by the pre-trial publicity and had already formulated conclusions of guilt.
There is no factual support in the record for defendant's first argument. Sheriff Gerard H. Wattigny testified, as did the other members of his office, that the transfer was standard procedure in his office for handling persons accused of capital *1345 offenses or other serious felonies. He stated that the reason for this procedure was because of the design of the Iberia Parish Prison. On visiting day, all of the prisoners are allowed to circulate freely in a particular segment of the prison with visitors and other prisoners. He explained that this situation creates a security problem in that the risk of escape is increased. For this reason, to prevent escape, capital prisoners or persons accused of other serious felonies have routinely been transferred to other adjoining parishes during the twenty-two years while Wattigny has been Sheriff of Iberia Parish. In addition, none of the witnesses called by the defense could testify that there had been any hue and outcry, or any suggestion of vigilante activity, in the community following the arrest of the defendant. All of the witnesses questioned testified that they were unaware of any public demonstrations against the defendant, and both members of the Sheriff's office and employees of the various media organs stated that they had not received any threatening telephone calls relating to the defendant. We conclude that the record does not support defense counsel's contention that the sentiment in the community was so strong that it necessitated a transfer of the defendant to another parish for the defendant's safety.
Defendant's second claim is that pretrial publicity had so prejudiced the community against the defendant that it would be impossible for the defendant to receive a fair trial. There is no dispute that the pre-trial coverage by the media was extensive and that there was significant public interest in the development of the case. The publicity, however, was not so overwhelming, nor so prejudicial, as the defense would have this Court believe. The defense introduced approximately twenty-four newspaper articles from the Daily Iberian, the daily newspaper of Iberia Parish. These articles were published from November 6, 1977, through April 2, 1978. The majority of the articles ran either on the front page or the city page, which is the front page of the second section. The circulation of the Daily Iberian in Iberia Parish is only approximately 7,000 papers.[2] While the editor testified that this had been the top story of the year, he also testified that there were others that had also created high interest. He further stated that the Sheriff's Office and the District Attorney's Office had been very reluctant to discuss the case. The sum of the testimony of the rest of the staff of the Iberian called by the defense reveals that the Iberian undertook no independent investigation but simply reported information which was released through either the Sheriff's or District Attorney's Office. Several of the newspaper employees testified that the case received no greater publicity than comparable crimes in the parish which had occurred in the past. The defense and the State also stipulated that several radio and television stations also broadcasted statements issued by the Sheriff's and District Attorney's Offices as the statements were released.
After carefully examining all of the evidence filed in the record, we conclude that while the publicity was extensive, it consisted primarily of factual information objectively reported regarding the events that were transpiring at the time. Only the barest of facts regarding the crime and its victims are contained in the pre-arrest articles. Also, the post-arrest articles generally were confined to factually reporting the occurrence and results of various pre-trial proceedings. It is abundantly clear from reading the record that the public officials involved cautiously guarded against any *1346 claim that the defendant was being tried through the media and released only the barest facts necessary to keep the interested public informed of the progress in the case. Likewise, the local media seemed satisfied to simply report these facts. There is a clear lack of any inflammatory journalism designed to whip up public prejudice or indignation against the defendant in this case.
In regard to the effect the publicity had on the citizens of Iberia Parish, the editor and other staff members of the Iberian testified that based upon their dealings with the public, they knew of no feelings or impressions in the minds of the citizens that would preclude the defendant from getting a fair trial.
The trial court held a "dry run" voir dire consistent with State v. Bell, supra, to determine the effect of the publicity on the prospective jurors. Defendant claims the testimony of the seven potential jurors that were examined established that such prejudice existed in the minds of the public so that no fair trial could be obtained in Iberia Parish. In connection with this, he claims the trial judge erred in interrupting defense counsel's direct examination of various witnesses and asking questions regarding whether the witness understood the presumption of innocence and other connected matters.
First, we find no error in the actions of the trial judge in interrupting counsel's examination to determine whether the witness understood the presumption of innocence, reasonable doubt and that a person would be asked, if sworn as a juror, to put aside any previous opinion he may have formulated and render a verdict strictly on the evidence presented at the trial.
A review of the testimony of the seven jurors causes us to conclude that the defendant failed to show such prejudice or undue influence in the community that the answers of prospective jurors on voir dire examination or testimony of witnesses at trial could be affected. Of the seven prospective jurors called, not one testified that he or she felt any pressure from any person or group outside the courtroom. A reading of the testimony indicates that the witnesses were quite candid and open in their answers. Also, of the seven witnesses called, they all testified that they could put aside whatever they had heard outside the courtroom, afford the defendant the presumption of innocence, and decide the question solely upon the evidence presented in court, although two of the prospective witnesses testified it would be difficult.[3]
We, therefore, conclude that the trial judge did not abuse his discretion in denying the defense motion for change of venue.

Assignment No. 2
By this assignment, the defense contends that the trial court was in error in refusing to require further psychiatric testing of the defendant regarding the defendant's mental capacity at the time the offense was committed. Prior to trial, defendant moved for appointment of a sanity commission to examine his (1) capacity to stand trial and (2) mental responsibility at the time of the alleged crimes. A sanity commission was appointed and a pre-trial hearing was held on March 31, 1978. At the conclusion of this hearing, the court ruled that the defendant had the requisite mental capacity to stand trial and it denied defense counsel's motion requesting the court to order further psychiatric evaluation into the defendant's mental capacity at the time of the offenses. The motion was re-urged and again denied on the morning of trial. The defendant subsequently changed his plea from not guilty and not guilty by reason of insanity to not guilty. The defense claims *1347 that it was forced to change the plea because it lacked sufficient evidence to support the defense of insanity. Counsel for defense asserts it could not obtain such evidence because the defendant was unable to afford further psychiatric examination and the court refused to order the State to provide the same.
LSA-C.Cr.P. art. 650 provides:
"When a defendant enters a combined plea of `not guilty and not guilty by reason of insanity,' the court may appoint a sanity commission as provided in Article 644 to make an examination as to the defendant's mental condition at the time of the offense. The court may also order the commission to make an examination as to the defendant's present mental capacity to proceed. Mental examinations and reports under this article shall be conducted and filed in conformity with Articles 644 through 646."
This Court has repeatedly held that this statute is permissive rather than mandatory and invests the trial judge with great discretion in the appointment of a sanity commission. State v. Taylor, 347 So.2d 172 (La.1977); State v. Link, 301 So.2d 339 (La.1974), and cases cited therein. When the defendant pleads "`not guilty and not guilty by reason of insanity'" the court is prohibited from determining the defendant's sanity at the time of the offense; this question is reserved for the jury. The burden is on the defendant to prove his insanity. State v. Link, supra at 341.
In the case before us the trial court appointed a sanity commission to report on both the defendant's mental capacity to stand trial and his mental capacity at the time of the offense. Dr. Joseph Musso, the Coroner of the Parish of Iberia, and Dr. Sidney J. Dupuy, the Psychiatric Director at the Acadiana Mental Health Center in Lafayette, Louisiana, were named to carry out this task. At the sanity hearing, the trial judge allowed counsel for the defense to cross-examine the two physicians regarding the defendant's sanity at the time of the offense.
Dr. Musso and Dr. Dupuy conducted separate psychiatric interviews with the defendant, each lasting approximately one hour. To aid them in formulating their conclusions, the defense provided the commission members with a psychological evaluation prepared by two psychologists employed by defense counsel. The evaluation included the results of three tests administered to the defendant: the Wechsler Adult Intelligence Scale, the Bender-Gestalt Test and the Rorschach Examination. Dr. Dupuy's conclusions were also aided by statements made by the defendant on December 1 and 2, 1977, regarding the commission of the crime.
Both members of the commission testified that they felt the defendant was sane at the time of the offense and could differentiate right from wrong. In response to defense counsel's inquiry, both testified that they believed further testing or investigation would not produce a contrary result.
The State's only witness at the hearing was the defendant's former employer. He testified that the defendant had been a reliable and trustworthy employee and that he had never experienced any problems with the defendant's intelligence or judgment. He also testified that if the defendant were acquitted, he would be willing to re-hire the defendant if a position were available.
The thrust of defense counsel's argument is that the sanity commission did not do a thorough job and that the trial court should have ordered additional investigation, including interviewing the family and friends of the defendant. Counsel argued that evidence gained in such interviews would shed new light on the conclusions reached by the commission.
We are unable to say the trial judge abused his discretion in refusing to order an additional investigation into the sanity of the defendant at the time of the offense. *1348 The defense presented no witnesses in support of its motion whose testimony might cause reconsideration by the commission of their conclusions. The only non-medical witness was presented by the State, and his testimony was contrary to the arguments raised by defense counsel. While this Court is sensitive to the plight of an indigent who must rely on findings of a sanity commission appointed by the court to examine him, State v. Bennett, 345 So.2d 1129 (La.1977) (on rehearing), the trial court is not required to reappoint sanity commissions until one produces a result with which the defendant agrees. See State v. Haley, 353 So.2d 1011 (La.1977).
Finding the trial court committed no error in denying the motion for further psychiatric examination, assignment No. 2 is without merit.

Assignment No. 5
By this assignment of error, the defense argues that the trial court was in error in denying a motion to set aside trial fixing. The issue presented by this assignment is whether the filing of a "separate" or "severed" indictment by the State, without an order by the court, requires re-arraignment.
Defendant and his brother were charged by joint indictment and arraigned as co-defendants on January 19, 1978. On March 31, 1978, the State announced in court its intention to try the defendant separately. At the same time, it informed counsel for the defense that it would file a separate indictment against defendant for the same crime charged in the joint indictment. The defense offered no objection to this procedure. Subsequently, the defense filed a motion to set aside the fixing of trial date, claiming that the filing of the separate indictment against the defendant constituted a new indictment and, therefore, required that the defendant be re-arraigned. This motion was denied on April 6, 1978.
Article 704 of the Louisiana Code of Criminal Procedure, in pertinent part, provides:
"Jointly indicted defendants shall be tried jointly unless:
"(1) The state elects to try them separately; or
"(2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance."
Article 705 provides:
"When the court has ordered severance of an indictment, the district attorney shall file separate indictments.
"In the case of a grand jury indictment, no further action by the grand jury is required. Severed indictments shall be considered as filed on the date of the filing of the original indictment. Proceedings under the original indictment are not affected by the severance except insofar as they may be inconsistent with some other provision of this Code. The effects of a severance, as stated in this article, apply to severances under Articles 532(3) and 704."
The defense seeks to draw a distinction between the two articles and argues that the State's power to try separately under a joint indictment under Article 704 is not the power to sever for the purposes of Article 705. Counsel claims that only the trial court has the power to "sever" under Article 705. Since what occurred in this case was not "severance," then the provision of Article 705 regarding the filing of separate indictments does not apply. The argument concludes that since the State did not have the power to "sever" under Article 705, by filing a separate indictment the State actually indicted the defendant on a new charge, for which he has the right to be arraigned.
The assignment lacks merit. We do not understand how the filing of a "severed" or "separate" indictment against a defendant by the State after the State has announced its intention to try jointly indicted defendants separately could be prejudicial to a defendant. The charge under the severed *1349 indictment was the same as that under the joint indictment and the defendant had already been arraigned under the joint indictment.
In State v. Bluain, 315 So.2d 749 (La. 1975), the defendant was arraigned under an original indictment which charged that the defendant committed "the crime of aggravated crime against nature as defined in R.S. 14:89.1 in that he did have unnatural carnal copulation with [the victim]." Prior to trial, the District Attorney was allowed to substantively amend the indictment to describe the unnatural sex acts charged that constituted the violation of the statute. The defendant argued that he was entitled to be rearraigned on the amended indictment. In that case we held:
"The function of an arraignment is to notify the defendant of the charge against him. LSA-C.Cr.P. Art. 551. Defendant was arraigned on the original indictment. His plea of not guilty also applied to the amended indictment, since the amendment was designed to cure deficiencies and not to alter the nature of the crime. [Citations omitted]. Under these circumstances, rearraignment was unnecessary." (State v. Bluain, 315 So.2d at 752)
We find our decision in Bluain, supra, to be analogous to the case at bar. Certainly there is no conceptual bar to allowing the State to proceed under a separate indictment following severance of a joint indictment without rearraigning the defendant since it is authorized under Article 705.[4] Further, in this case there is no doubt that the separate or severed indictment charged the same offense as the joint indictment under which the defendant had previously been arraigned. Hence, the defendant was adequately notified of the charge against him. Finally, while counsel for defense claims that the procedure adopted by the State was improper, he fails to make any allegations as to how the procedure prejudiced the defendant.
For all of the above reasons, we find this assignment to be without merit.

Assignment of Error No. 7
By this assignment, the defense contends that the trial judge was in error in failing to grant three challenges for cause made by the defense relating to prospective jurors, Mrs. Flossie Berard, Camille Brigante and Kenneth Romero.
LSA-C.Cr.P. art. 797, in pertinent part, provides:
"The state or the defendant may challenge a juror for cause on the ground that:
"(1) The juror lacks a qualification required by law;
"(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
"(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
"(4) The juror will not accept the law as given to him by the court...."
LSA-C.Cr.P. art. 800, in pertinent part, provides:
"A defendant cannot complain of a ruling refusing to sustain a challenge for cause made by him, unless his peremptory challenges shall have been exhausted before the completion of the panel." *1350 Under this article, there is no doubt that the defendant need only show two things to obtain reversible error: (1) that the trial judge erred in refusing to sustain a challenge for cause by the defendant; and (2) that he exhausted all of his peremptory challenges. State v. Monroe, 366 So.2d 1345 (La.1978); State v. McIntyre, 365 So.2d 1348 (La.1978); State v. Qualls, 353 So.2d 978 (La.1977); State v. Ballard, 337 So.2d 481 (La.1976). The trial judge is vested with broad discretion in ruling on a challenge for cause, which ruling will not be disturbed on appeal absent a showing of abuse. State v. Monroe, supra; State v. McIntyre, supra; State v. Drew, 360 So.2d 500 (La.1978); State v. Crochet, 354 So.2d 1288 (La.1977). In reference to the trial judge's great discretion in this area, this Court noted in State v. Passman, 345 So.2d 874 (La.1977), the following:
"We have repeatedly held that the trial judge is vested with broad discretion in ruling on challenges for cause, and only where it appears, upon review of the voir dire examination as a whole, that the judge's exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the accused, will this Court reverse the ruling of the trial judge. . . ." (345 So.2d at 880)
With these basic principles in mind, we turn to review the rulings of the trial court on each juror in question.

MRS. FLOSSIE BERARD
In voir dire, it was determined that Berard's niece was married to David Bourque, the brother of Loretta Bourque, one of the victims in this case. Also, her mother and father were old friends of the LeBlanc family (the family of the other victim) and Berard had known David LeBlanc since he was a baby. At the time he was killed, David LeBlanc was employed by another of Mrs. Berard's brothers. Finally, it was brought out that her brother was serving, at the time, as Sheriff of St. Martin Parish, the parish where the abductions occurred.[5]
On examination by the State, she stated that she did not believe that the fact that her family had known the LeBlanc family for so long would affect her ability to be impartial and that she would decide the case entirely upon the evidence presented in court. She stated that she had not discussed the case with any of the members of the two victims' families, or with her brother, the Sheriff. She admitted knowing some deputy sheriffs other than her brother but testified that she would not be unduly influenced by the testimony of a person simply because he was a deputy sheriff and would judge their credibility in the same manner as she would any other person. She unequivocally stated that no individual, or group of individuals, outside the courtroom would influence her in any way.
Examination by the defense disclosed that Mrs. Berard had lived in New Iberia for 28 years, had three children, ages 26, 23 and 21, and was a housewife. She was a graduate of Spencer's College and subscribed to and read regularly both the Daily Iberian and Times Picayune newspapers. Also, she had previously served on a jury in federal court.
In response to questions regarding the marriage of her niece to Loretta Bourque's brother, David Bourque, she testified that she could not recall how long they had been married. She stated that they had visited each other's homes in the past but that normally when she visited her niece, David would not be home. She again acknowledged that her family had always considered the LeBlanc family to be very close. She stated, in response to a question from defense counsel, that in spite of her connections with the victims, she believed she could be 100 percent impartial toward the *1351 defendant. Mrs. Berard stated that she did not know whether the defendant was guilty or not since she had not heard the evidence. All she knew was what she had read in the paper and she considered the paper to be unreliable. The final exchange occurred as follows:
"Q. But even taking all of that into consideration, you feel that you could be one hundred percent impartial?
"A. Right.
"Q. And decide this matter solely on the evidence to be produced?
"A. Right.
"Q. And if the defendant chose not to produce any evidence
"A. Oh yeah, butwell, I know that, cause the case I went to, the one that they were trying, he did not get on the witness stand.
"Q. You didn't infer anything from that?
"A. No.
"Q. You understood he had the absolute right not to take the stand?
"A. That's right, they told us that same thing as Judge Bienvenu told us.
"Q. And it didn't make a difference in your vote on a verdict on that trial, nor
"A. No, cause that's the first thing they told us when they chose us.
"Q. Thank you very much."
Defendant claims that the trial court should have upheld his challenge for cause on the basis of Article 797(3):
"The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict."
We are unable to conclude that the trial judge abused his discretion in denying the challenge for cause. Our reading of the voir dire examination as a whole discloses that Mrs. Berard showed herself to be an educated, intelligent and reasonably articulate individual who was quite candid in admitting the connection she had with the victims. She also acknowledged that her brother was the Sheriff in neighboring St. Martin Parish. However, throughout the entire voir dire she was unequivocal in her statements that she had no preformulated opinions of guilt, that she could decide the case solely upon the evidence presented in court and that she did not feel any pressure from anyone outside the courtroom which might influence her judgment.
The fact that a prospective juror knows the victim of an offense is not in itself sufficient grounds for a challenge for cause under Article 797. State v. Crochet, 354 So.2d 1288 (La.1977); State v. Clark, 340 So.2d 208 (La.1976); State v. May, 339 So.2d 764 (La.1976); State v. Higginbotham, 261 La. 983, 261 So.2d 638 (La.1972); State v. McClure, 258 La. 999, 249 So.2d 109 (1971); State v. Blanton, 312 So.2d 329 (La. 1975). The defense must show that the juror's acquaintance with the victim is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict. State v. Clark, supra; State v. May, supra.
In State v. Rogers, 241 La. 841, 132 So.2d 819 (1961), cert. denied, 370 U.S. 963, 82 S.Ct. 1589, 8 L.Ed.2d 830, the defendant was charged with the murder-rape of the wife of a local grocer in Reddell, Louisiana.[6] The victim was found murdered in the family grocery store. Defendant appealed the trial court's refusal to grant his challenge for cause of a prospective juror named Fred Bordelon. Examining the portion of the transcript touching on the juror in question, we noted:
"On voir dire, Fred Bordelon, a resident of Evangeline Parish for forty-six years, *1352 stated that he was in the wholesale grocery business and sold merchandise to Lumney Guillory, a childhood friend of his and husband of the deceased; that he had known the victim for about ten years before her death, but that this fact would not alter his decision if he were selected on the jury panel. Mr. Bordelon testified that he had discussed the instant offense slightly with relatives and friends, but that he had no fixed opinion about the case; that his decision would be no different in the instant matter from a decision he would make if a white person were on trial for killing a colored individual. This prospective juror affirmed that he felt that he could arrive at a proper decision after weighing the evidence presented." (132 So.2d at 836)
The evidence also established that Bordelon had himself been robbed at his store four or five times in the past. In that case this Court refused to disturb the ruling of the trial court rejecting defendant's challenge for cause.
We believe the prospective juror's contacts with the victims in this case are no greater than those exhibited in State v. Rogers, supra, above. It is clear that the relationship of Mrs. Berard to the victims in this case does not place the prospective juror within Article 797(3) so clearly as did the facts in State v. Monroe, supra, and State v. McIntyre, supra, recently decided by the Court. We find that Mrs. Berard's relationship to the victims, considering the testimony of the prospective juror, was not so close that one might reasonably conclude that it would have influenced her in arriving at a verdict. See, also, State v. Crochet, supra; State v. Blanton, supra; State v. Hodgeson, 305 So.2d 421 (La.1974); State v. Taylor, 282 So.2d 491 (La.1973), reversed on other grounds, 419 U.S. 522, 95 S.Ct. 692, 704, 42 L.Ed.2d 690 (1975); State v. Richmond, 278 So.2d 17 (La.1973); State v. Rideau, 242 La. 431, 137 So.2d 283 (1962), reversed on other grounds, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663.
Relationship to law enforcement officers does not necessarily require a challenge for cause. State v. Qualls, supra; State v. Madison, 345 So.2d 485 (La.1977). In State v. Calloway, 343 So.2d 694 (La. 1976), where the prospective juror sought to be challenged had a nephew who was a police officer, this Court said:
"It is well settled that the relationships to persons who might be prejudiced does not, `ipso facto' disqualify a person from serving as a juror. The connection must `be such that one might reasonably conclude that it would influence the juror in arriving at the verdict.' ..." (State v. Calloway, supra at 696)
Mrs. Berard's brother was the Sheriff in St. Martin Parish. The trial in which she was asked to participate took place in Iberia Parish. While the St. Martin Parish Sheriff's Office did have some involvement in investigating the criminal activity of the defendant in St. Martin Parish, Mrs. Berard testified unequivocally that her brother never discussed the case with her or other members of her family. While we recognize the closeness of this issue, we conclude, after careful review of the voir dire examination as a whole, that the juror's state of mind was not such that she would have been unable to render impartial justice in this case.
We, therefore, find no abuse of discretion in the trial judge's refusal to grant defendant's challenge for cause regarding Mrs. Berard.

CAMILLE BRIGANTE
During the voir dire examination, Brigante initially testified that he was familiar with the facts of the case, that he believed the defendant to be guilty based upon what he had read in the paper and that he would require the defendant to present some evidence in order to change his opinion. After instruction by the judge, Brigante acknowledged that he understood the principles of burden of proof, presumption *1353 of innocence and reasonable doubt. He also stated that he believed he could set aside his prior opinion, consider only the evidence presented in court and render a fair and impartial verdict. He further stated he would accept the law as given to him by the trial judge.
As stated above, this Court will not set aside a trial court's ruling unless it appears, upon review of the voir dire examination as a whole, that the judge exercised his discretion in an arbitrary and unreasonable manner that results in prejudice to a defendant. State v. Webb, 364 So.2d 984 (La.1978); State v. Passman, supra; State v. Madison, supra. In State v. Passman, when faced with a similar challenge, we held:
"A trial judge's refusal to excuse a prospective juror for cause is not an abuse of his discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, where subsequently, on further inquiry or instruction, he has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. [Citations omitted]" (State v. Passman,] 345 So.2d at 880)
See, also, State v. Gray, 351 So.2d 448 (La. 1977).
A full review of the examination of Brigante renders inescapable the conclusion that Brigante was "rehabilitated," and his earlier testimony that he had formulated an opinion must give way to his later positive and unequivocal testimony that he would be impartial, accept the law as given to him by the court and decide the case wholly upon evidence presented at the trial. We find no error in the trial court's denial of defense counsel's challenge for cause of Brigante.

KENNETH ROMERO
Romero testified he was a radio announcer for KANE Radio in New Iberia. He testified that he had read news broadcasts relating to the crime and the pre-trial proceedings. He stated that while he was familiar with the case, he had formulated no opinion regarding the defendant's guilt or innocence, could accept the law as given by the court and would decide the case solely on the evidence produced at the trial.
Defendant claims that because Romero candidly remarked that if he were the defendant he would have reservations about someone in his position serving on the jury, the challenge for cause should have been granted. We disagree.
It is well settled that the mere fact that a prospective juror has knowledge of facts surrounding the occurrence of the offense does not necessarily make him subject to a challenge for cause. It is clear that Romero had no more knowledge of the offense than any other person who may have read the newspaper or listened to the radio. He testified that all he did was read the newscasts and took no part in investigative reporting at all. More important, he testified unequivocally that he had no preformulated opinion regarding the defendant's guilt or innocence at all.
Regarding defendant's second contention, Romero did not say he believed himself to be partial, he simply related, at the request of defense counsel, that if he were the defendant, he would have some doubts about his impartiality. We think this observation is not probative in the least as to whether Romero actually could be impartial. We find nothing in his testimony to warrant the conclusion that Romero could not have been an impartial juror. We conclude that the trial judge properly denied the challenge for cause as to Romero.
Since the defendant has failed to show that the trial judge erred in denying any of defendant's challenges for cause, we find no reversible error in this assignment.

Assignment No. 8
By this assignment, defendant argues that the trial court was in error in admitting a photograph of the victims into evidence.
In Louisiana, the admissibility of gruesome or inflammatory photographs is *1354 determined by weighing the probative value of the picture against any possible prejudicial effect it may have on the jury. E. g., State v. Scott, 337 So.2d 1087 (La.1976); State v. Hollingsworth, 337 So.2d 461 (La. 1976); State v. Cooper, 334 So.2d 211 (La. 1976).
In this case the photograph was offered to prove the identity of the victims, the position of the bodies and to explain why some of the brass casings that were fired were not found. There is nothing gruesome about the photo. There are no wounds or blood visible on the two victims. The defendant's sole claim is that the photo is inflammatory in that it appears to show the two victims were holding hands.
The defense offered to stipulate the position of the bodies and that the persons in the photos were the dead victims. The State declined the stipulation and the photo was admitted by the trial judge.
We conclude that the trial judge did not abuse his discretion in admitting the photo in question. The photo was highly relevant to establish a killing beyond a reasonable doubt and to prove details and clarify questions in the minds of the jury. See State v. Hall, 256 La. 336, 236 So.2d 489 (1970). This is so particularly in light of the fact that the defendant testified on his own behalf and contradicted some of his earlier statements. The photo is certainly not gruesome. It shows two persons lying face down on the ground. There are no visible wounds, blood or indications of violence. While one may speculate that the victims might be holding hands in the photo, it is not patently obvious. Even if it were, we would, nevertheless, be inclined to find that whatever slight inflammatory qualities this feature may produce are outweighed by the probative value of the photograph. We find this assignment lacks merit.

Assignment No. 9
By this assignment, the defense argues that the trial court was in error in denying a motion to suppress three confessions made by defendant.
A hearing was held on the motion to suppress these confessions during trial. The following evidence was adduced: Seven police officers arrested defendant on December 1, 1977. Because Helen Sonnier had told the officers that defendant was armed and would not "be taken alive," they were heavily armed. Defendant was arrested without incident when he returned to his place of employment after making a trip to Beaumont. When he was arrested, defendant was orally informed of his rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant stated that he understood the charges against him and understood his rights. He was then transported to the Iberia Parish Courthouse.
Defendant was booked and taken to the Sheriff's Office where he was questioned by Major Horace Comeaux and Lieutenant Russell Duplantis. Both men testified that defendant was not threatened or offered any inducements to talk. Defendant was told that he did not have to speak if he did not want to and was asked if he had been advised of his rights arid whether or not he understood them. Defendant replied affirmatively. At first, defendant denied any knowledge of the murder. Comeaux told defendant that a statement from him was not necessary because his brother, already in custody, had given police a statement, and that the guns used during the crime had already been recovered. Defendant then gave a statement, which was written down by Comeaux. After the statement was completed, defendant read the written confession as Comeaux had written it and signed each page (Comeaux and Duplantis also signed).
Defendant was then taken to Lafayette Parish jail. While enroute, he made a statement that he was glad to get it over with. He also stated that the murders would not have occurred if his brother had not seen the victims' automobile. He was also extremely angry at his brother for having confessed and stated that when he *1355 got to Angola he would send him home to his mother "with a tag on his toe." The officers traveling with defendant testified this statement was completely spontaneous and that at no time was the defendant threatened, coerced, or induced into making it.
The next day, defendant made a statement that was recorded in the presence of three officers. Defendant was advised of his Miranda rights and signed a waiver. He was advised that everything was being tape recorded. He confessed, not only to the crime for which he was on trial, but also a number of other crimes which had been committed in the same area and manner but during which no one had been injured or killed. The officers who were present when the statement was made testified that it was made freely and voluntarily.
In brief to this Court, the defense argues that these statements should have been suppressed because defendant was intimidated by the number of officers and by the number of firearms that they carried. At the hearing, the defense also argued that the taped confession should have been suppressed because portions of it had been deleted.[7]
The State must establish beyond a reasonable doubt that a confession or inculpatory statement was made freely and voluntarily before it can be introduced at trial. LSA-C.Cr.P. art. 703(C); LSA-R.S. 15:451; e. g. State v. Hebert, 356 So.2d 991 (La.1978); State v. Adams, 347 So.2d 195 (1977). Furthermore, if the statement was obtained during custodial interrogation, the State must show that the accused was advised of his constitutional rights (Miranda). State v. Hutto, 349 So.2d 318 (La.1977); State v. Haynes, 339 So.2d 328 (La.1977). The admissibility of the statement is for the trial judge to determine and his conclusions as to the credibility and weight of the testimony relating to the voluntariness of the statement will not be overturned unless they are unsupported by the evidence. E. g. State v. Simmons, 340 So.2d 1357 (La. 1976); State v. Hills, 337 So.2d 1155 (La. 1976).
The evidence presented by the State was overwhelming that the confessions were freely and voluntarily made and were not given as a result of fear, duress, intimidation, menaces, threats, inducements or promises. There was no evidence presented at the hearing to support defendant's argument that the confessions were not freely and voluntarily made. Counsel's bare assertion that the confession was not free and voluntary because the defendant was arrested by seven armed officers is totally unconvincing in light of the contrary evidence contained in the record. The statements were made some time after the defendant's arrest in the presence of only two detectives (who were armed with weapons concealed by their clothing). The defense offered no evidence of any threats, coercion or inducements to contradict the testimony of the witnesses for the State.
The circumstances surrounding the taking of the confession support the trial judge's conclusion that the State met its burden of proving the confessions were voluntarily made. We find this assignment lacks merit.

Other Assignments
Assignment of error No. 11 regarding the trial judge's charge to the jury regarding principals was neither briefed nor argued before this Court and, therefore, is considered abandoned. State v. Wientjes, 341 So.2d 390 (La.1976); State v. Phillips, 337 So.2d 1157 (La.1976); State v. Matthews, *1356 292 So.2d 226 (La.1974). We have also carefully considered defendant's assignments of error Nos. 4, 6, 10 and 12. We find that none of these assignments of error present reversible error, nor do any involve legal issues not governed by well established principles of law. Therefore, assignment Nos. 4, 6, 10 and 12 are rejected as having no merit.

SENTENCE

(1) Assignments of Error

Assignment No. 1
By this assignment, the defendant claims that there is no provision in the law which requires that the State give the defendant notice of which aggravating circumstances the State will rely on in seeking the death penalty. He argues that this failure violates his rights to due process of law and denies him sufficient opportunity to prepare a defense.
Unquestionably, the need for reliability in the determination of whether to impose the death penalty by adversary proceedings demands that an accused be afforded full rights of due process. Accordingly, a defendant is entitled in a capital sentencing proceeding, no less than in the guilt or innocence trial, to be informed of the nature and cause of the accusation against him, LSA-Const. art. 1, § 13 (1974), and to his Fifth Amendment right to "[n]otice... given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded, and `[setting] forth the alleged misconduct with particularity.'" In Re Gault, 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527, 459 (1967). Thus, the defendant is entitled to know the aggravating circumstances which the prosecution will seek to prove sufficiently in advance of court proceedings so that reasonable opportunity to prepare will be afforded.
The defendant lacks standing to raise this issue. He has not alleged that he was not informed of which aggravating circumstances on which the State would rely, nor does the record disclose that he made any attempt to obtain such information. Had such showings been made, the issue would be properly before this Court. We find this assignment to be without merit.

Assignment No. 2
By this assignment, defendant claims that Louisiana Code of Criminal Procedure Article 905.3 places the burden on the defendant to explain why he should not be given the death sentence.
We find this argument totally unpersuasive. Article 905.3 provides:
"A sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, recommends that the sentence of death be imposed...."
This article places on the State the burden to prove beyond a reasonable doubt that at least one or more statutory aggravating circumstances exists. If the jury finds the State has not done so, it may not consider the penalty of death. The fact that the district attorney in some cases, may at the sentencing portion, simply ask the jury to consider evidence already introduced at the guilt portion in making its determination of the existence of any statutory aggravating circumstance does not reduce the burden of proof placed upon the State. We find this assignment without merit.

Assignment No. 3
By this assignment, the defendant claims that the portion of Article 905.2 which permits the jury to consider "any evidence offered at the trial on the issue of guilt" injects into the proceeding an element of arbitrariness.
Our statutory scheme is structured so that the jury's discretion is "controlled by clear and objective standards so as to produce *1357 non-discriminatory application." Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 2936, 49 L.Ed.2d 859 (1976). The objective standards referred to are the statutory aggravating circumstances listed in Article 905.4. The United States Supreme Court noted approvingly in Gregg v. Georgia, supra, 96 S.Ct. at 2936, that in addition to the requirement that the jury find beyond a reasonable doubt that at least one statutory aggravating circumstance exists, the jury was also authorized to consider any other appropriate aggravating or mitigating circumstances.
Thus, even were we to construe the quoted language in the manner that the defendant requests, we would, nevertheless, conclude that such a construction has been constitutionally approved. This assignment is without merit.

Assignment No. 4
By this assignment, the defendant claims the trial judge erred in giving an improper instruction to the jury. While the jury was deliberating on the sentence, they sent a message out that they had several questions they desired answered. One such question, as read into the record by the trial judge, was as follows:
"Pertaining to life sentence, life imprisonment without benefit of probation, parole, or suspension of sentence. Being cautious, the jury would like to know if the defendant will be eligible for work release programs, or Governor's pardon."
The trial court informed the jury that the Governor may exercise his executive right to pardon any crime, no matter what the sentence. No complaint is made of this portion of the charge. After consultation with attorneys for both the State and the defense, and with the full consent of both, the judge charged the jury regarding the defendant's potential eligibility for work release as follows:
"With regard to the question about work release, I'll read to you now from Section one one one one of Title fifteen of our Revi[s]ed Statutes. Paragraphs A and B of that section I think are applicable to your question. I'll read only paragraphs A and B. A, the Louisiana Department of Institutions is hereby authorized to establish and administer a work release program for inmates of any institution under the jurisdiction of the Department. B, the Department shall establish rules for the administration of the work release program, and shall determine those inmates who may participate in the release program, notwithstanding any provision of law to the contrary. Any convict sentenced to imprisonment at hard labor shall be eligible at any time during his sentence to participate in the work release program, subject to the provisions of this part. If any inmate violates the conditions prescribed by the Department, his work release privileges may be withdrawn. Failure to report to, or return from the planned employment shall be considered an escape under the provisions of Revised Statutes 14:110. The Department may approve as work release privileges placement in universities, colleges, technical vocational or trade schools, or in sheltered workshops, or in training programs designed to improve the skills and abilities of the inmate. That's the end of B. Now, I want to add this. We do not have available for your consideration at this time the `rules' discussed in paragraph B that I have just read to you. Does that answer that question?" (Record, pp. 1839-1841)
Counsel for the defendant argued before this Court that he erred in agreeing to the charge. He claims that the sole reason the jury later returned the sentence of death was they feared that one day the defendant may return to Iberia Parish through the work release program and that this was an improper factor for the jury to take into consideration.
we have no way of knowing what effect, if any, the charge had on the jury's verdict. We do know that the jury found one or *1358 more aggravating circumstances. It is most difficult to consider the jury's request for such an instruction as arbitrary. In the interest of a perfect trial, as distinguished from a fair trial, 20-20 hindsight would direct us to advise the trial judge to consider only our rules on sentencing guidelines and no other. Nevertheless, should we speculate, it is reasonable to speculate that the jury wanted to know whether life meant life and balance this fact against the aggravating circumstances which justify the death penalty.
This assignment is without merit.

(2) Capital Sentence Review
The defendant was tried in accordance with the provisions of Louisiana Code of Criminal Procedure Article 905.1-905.9 (1976), which provides for a bifurcated trial in capital cases. At the conclusion of the sentencing hearing, the jury returned a unanimous recommendation that the defendant be sentenced to death on each murder charge. On April 25, 1978, the trial judge followed the binding recommendation of the jury and sentenced Elmo Sonnier to death on both counts.
Article 905.9 of the Code of Criminal Procedure requires us to review every sentence of death to determine if it is excessive. That article also mandates this Court to establish procedures to satisfy constitutional criteria for that review. Pursuant to this authorization, we adopted Supreme Court Rule 28, § 1, on Review Guidelines, which provides:
"Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
"(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
"(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
"(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
This is the same procedure for review authorized by Georgia statute approved by the United States Supreme Court in Gregg v. Georgia, supra. To aid us in this review, we have been furnished a complete transcript of the record of the sentencing portion of the trial, a Sentence Investigation Report, a Uniform Capital Sentence Report, and a memorandum on behalf of the defense regarding the propriety of the sentence, all in accordance was the capital sentence review requirements adopted by this Court.

Passion, Prejudice or Arbitrary Factors
Counsel for defense claimed the sentence was the result of passion and prejudice by reiterating the arguments advanced by him in support of the motion for change of venue. As noted above, we find those claims to be without merit.
Our complete review of the record, both the the guilt and sentencing portions, together with the capital sentencing report submitted by the trial judge, leads us to conclude that the jury was not influenced by passion, prejudice or any other arbitrary factors.

Aggravating Circumstances
The jury found the following aggravating circumstances to have existed:
(1) The offender was engaged in the perpetration or attempted perpetration of aggravated kidnapping.
(2) The offender was engaged in the perpetration or attempted perpetration of aggravated burglary.
(3) The offender was engaged in the perpetration or attempted perpetration of armed robbery.
(4) The offender knowingly created a risk of death or great bodily harm to more than one person.
(5) The offense was committed in an especially heinous, atrocious or cruel manner.
Article 905.3 provides:

*1359 "A sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstances exists and, after consideration of any mitigating circumstances, recommends that the sentence of death be imposed...." (Emphasis supplied)
We read this section to mean that if the jury correctly finds that one statutory aggravating circumstance exists, it is empowered to consider the death penalty. As long as the jury is required to find at least one statutory aggravating circumstance, the jury's discretion is "controlled by clear and objective standards so as to produce nondiscriminatory application." Gregg v. Georgia, supra, 96 S.Ct. at 2936.
(1) Armed Robbery. The evidence clearly established that the two brothers were armed with a dangerous weapon when they approached the victims' vehicle and confiscated the driver's licenses of the young couple. According to the defendant, the licenses were later destroyed. The evidence also suggested that the victims' wallets had been rifled and thirty or forty dollars was unaccounted for. Finally, the defendant admitted to taking a jack from the victims' vehicle. The jack was later recovered from the trunk of defendant's car.
Armed robbery is defined as "the theft of anything of value from the person of another or which is in the immediate control of another by force or intimidation while armed with a dangerous weapon." We feel there was sufficient evidence from which the jury could have concluded that armed robbery was an aggravating circumstance.
(2) Aggravated Burglary. R.S. 14:60, in pertinent part, defines aggravated burglary as follows:
"[T]he unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, if the offender,
"(1) is armed with a dangerous weapon. . . ."
The evidence showed that when the Sonnier brothers first accosted the couple one, or both, of them entered the LeBlanc vehicle without permission while armed with a 22-caliber rifle. The testimony of both the defendant and his brother also established beyond any reasonable doubt that the defendant and his brother, at the very least, had the intent to commit simple kidnapping when they entered the victims' vehicle. Since simple kidnapping is a felony, we need not decide at this point whether the jury could have found that the defendant also intended to commit rape, armed robbery and murder when he made the unauthorized entry. There was sufficient evidence from which the jury could have concluded that aggravated burglary was an aggravating circumstance.
(3) Aggravated Kidnapping. R.S. 14:44 provides:
"Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:
"(1) The forcible seizing and carrying of any person from one place to another...."
There is no question that the record supports the conclusion that the defendant forcibly seized and transported the victims from one place to another. We believe the evidence also fairly supports the conclusion that Loretta Bourque engaged in sexual intercourse with one or both of the Sonnier brothers in exchange for a promise that both she and David LeBlanc would be released unharmed. Eddie Sonnier testified that this was the condition under which he was able to have intercourse with the female victim. The primary issue to be resolved is whether "sexual gratification" is *1360 something of "value" or an "advantage" under R.S. 14:44. We believe that it is. In State v. Felton, 339 So.2d 797 (La.1976), we were asked to determine whether sexual gratification was "anything of value or any acquittance, advantage, or immunity of any description" under R.S. 14:66 (Extortion). There, a police officer was found guilty of accosting a couple in their automobile and threatening to arrest them if they did not perform specified sex acts in his presence. He also forced the female victim to have intercourse with him under the same threat. In Felton, we held:
"... [T]he crime of extortion is committed when, by the use of threats, the accused obtains from the victim performance (or non-performance) of a substantial act for the advantage (here, sexual gratification) of the accused." (339 So.2d at 799-800)
Likewise, we believe the crime of aggravated kidnapping occurs when an offender forcibly seizes and carries a person from one place to another with the intent to force the victim, or some other person, to perform a sexual act, or acts, for the advantage (sexual gratification) of the offender as a condition of the release of the person seized. State v. Dickinson and McNemar, 370 So.2d 557 (La.1979).
We believe there was sufficient evidence from which the jury could conclude that the defendant and his brother abducted the couple with the intention of forcing the female victim to engage in sexual relations in order to secure the couple's safe release. There was no error in the jury's finding that aggravated kidnapping was an aggravating circumstance.
(4) The offense was committed in an especially heinous, atrocious, or cruel manner. This aggravating circumstance was also included in the Model Penal Code and has been adopted by a number of states other than Louisiana. The United States Supreme Court, in examining the same provision in a Florida statute, noted the following:
"That Court [the Florida Supreme Court] has recognized that while it is arguable `that all killings are atrocious... [s]till we believe that the Legislature intended something "especially" heinous, atrocious or cruel when it authorized the death penalty for first degree murder.' Tedder v. State, [Fla.,] 322 So.2d [908,] at 910. As a consequence, the court has indicated that the eighth statutory provision is directed only at `the conscienceless or pitiless crime which is unnecessarily torturous to the victim.' State v. Dixon, [Fla.,] 283 So.2d [1,] at 9. See also Alford v. State, [Fla.,] 307 So.2d 433, 445 (1975); Halliwell v. State, supra [,Fla.,] 323 So.2d [557,] at 561. We cannot say that the provision as so construed, provides inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases." (Proffitt v. Florida, 428 U.S. 242, 255-256, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 [1976])
State v. Dixon, 283 So.2d 1 (Fla.1973), referred to approvingly by the Supreme Court in Proffitt involved a certification to the Florida Supreme Court from four lower courts regarding the constitutionality of the death statute in that state. The Florida court said:
"The aggravating circumstance which has been most frequently attacked is the provision that commission of an especially heinous, atrocious or cruel capital felony constitutes an aggravated capital felony... Again, we feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to *1361 set the crime apart from the norm of capital feloniesthe conscienceless or pitiless crime which is unnecessarily torturous to the victim." (State v. Dixon, 283 So.2d at 9)
State v. Alford, supra, also approvingly referred to in text by the Court, involved a 13-year-old girl who was abducted and raped by the defendant. She was found blindfolded, with her hands tied behind her back, after having been shot to death execution style. The Florida Supreme Court affirmed a finding that the crime had been committed in an especially heinous, atrocious and cruel manner. The United States Supreme Court also approvingly referred to a number of other Florida cases in which the provision had been applied. Most notably among them was a case similar in some aspects to the case at bar. In Douglas v. State, 328 So.2d 18 (Fla.1976), the defendant kidnapped the victim and his wife and drove them via a circuitous route to a remote area where he made them undress and perform various sexual acts in his presence. The defendant then struck the victim in the head with a rifle with such force that it shattered the rifle stock. He then shot the victim three times in the back of the head. The female was then forced to perform various sexual acts upon and with the defendant. After recounting the evidence, the Florida court said:
"... The abuse to which the victim was subjected to prior to his death and the manner in which he was killed was especially heinous, atrocious and cruel." (Douglas v. State, 328 So.2d at 21-22)
In a companion case to Proffitt v. Florida, supra, and Gregg v. Georgia, supra, the Supreme Court in Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), declared unconstitutional Louisiana's capital punishment statute. In response, our legislature passed the present statutory scheme which was modeled after the statute upheld in Gregg v. Georgia, supra. We believe the legislature clearly intended this Court to interpret the new capital punishment law with reference to the constitutionally-approved interpretations contained in Gregg, Proffitt and their companion cases.
In State v. English, 367 So.2d 815 (La. 1979), this Court suggested in dicta:
"[A]ny system that seeks to distinguish rationally among murders in terms of heinousness, must necessarily incorporate into that concept some idea of torture or the pitiless infliction of unnecessary pain on the victim. [Citing Proffitt and Gregg]" (367 So.2d at 823)
Today, we adopt as part of our finding this interpretation. However, our analysis above leads us to conclude that the legislature intended that the torture or pitiless infliction of pain could be either physical or psychological. Certainly the homicides in State v. Alford, supra, and Douglas v. State, supra, referred to approvingly by the U.S. Supreme Court in Proffitt, supra, and discussed above, could only be described as heinous, atrocious and cruel because of the severe psychological trauma inflicted upon the victims before they were killed.
In the instant case, the victims were seized at gunpoint around 1:00 A.M. in the morning while parking in a remote area of St. Martinville Parish. The evidence established that they were handcuffed, placed in the rear seat of their car and driven for twenty-one miles along back roads to a remote spot in Iberia Parish. Eddie Sonnier testified that David LeBlanc was taken into the woods and handcuffed to a tree while his girlfriend was taken a short distance away. After the defendant had finished raping the female victim, his brother had intercourse with her on a promise that the couple would be released unharmed. Eddie testified that the defendant returned and watched him and the girl have intercourse after leaving momentarily to check on LeBlanc. It is difficult to imagine the agony and suffering LeBlanc must have felt as he waited helplessly handcuffed to a *1362 tree while his girlfriend was being raped only a short distance away. Of course, the ordeal must have been even more terrorizing for Bourque, who was forced to have intercourse with both of her abductors in order to secure a promise of safe release.
"Pitiless" and "conscienceless" are appropriate terms to describe the mental state of the defendant who forced the couple to lie side by side, face down, to be shot and killed in order to assure that neither could report the crime. The helpless victims were notified of their impending doom by a first shot which missed both of them. If the jury accepted the defendant's original version of the story, there was a delay following that shot while the defendant told Eddie Sonnier that he (Eddie) could not shoot and that he should hold the flashlight while the defendant did the shooting. Such utter indifference to the suffering of those two innocent youngsters as they waited to die could certainly be characterized as "cruel" within the meaning of our statute.
We believe that based upon the abuse that the evidence established that the victims were subjected to prior to their death and the manner in which they were killed the jury committed no error in finding the crime was committed in an especially heinous, atrocious and cruel manner.
(5) Risk of death or great bodily harm to more than one person. In the appendix in State v. English, supra, we indicated that the better interpretation of this provision was that a single consecutive course of conduct, which creates a risk of death or great bodily harm to more than one person, is within the contemplation of the statutory language, and that the legislature probably did not intend for it to apply only when there is one act, i. e., shooting into a crowd (where the same act which caused the killing also created the risk of death or great bodily injuries to others). Today, we need only hold that where an offender kills two or more persons during a single consecutive course of conduct for the purpose of preventing any one of those killed from disclosing the murder of the other, or others, then the offender's conduct is within the contemplated statutory meaning. See Proffitt v. Florida, supra, 428 U.S. at 256, 96 S.Ct. at 2968; Alvord v. State, 322 So.2d 533 (Fla.1975).
In the instant case, the evidence without doubt supports the conclusion that the defendant murdered the victims one after the other as part of a single consecutive course of conduct in order to prevent either victim from reporting to the police the rapes or the murder of the other victim. The jury committed no error in finding that a risk of death or great bodily harm to more than one person was an aggravating circumstance.

Conclusion
We find the evidence supports the jury's finding of all the statutory aggravating circumstances relied upon and set forth in their verdict.

Comparison with Other Cases
Section 4(b) of Rule 28 of our Court rules requires the district attorney to include in his sentence review memoranda a synopsis of each first degree murder case in the district in which sentence was imposed after January 1, 1976. The purpose of this requirement is to aid this Court in determining whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Elmo Patrick Sonnier is a white male, age twenty-eight years (twenty-six at the time of the offense). He attended school through the seventh grade at which time he quit and went to work in the oil fields. The Wechsler Adult Intelligence Scale Test conducted on January 31, 1978, indicated a verbal I.Q. score of dull-normal range (84), a performance I.Q. score in the average range (98) and a full scale I.Q. in the average *1363 range (90). No neurological impairment was noted by the Bender-Gestalt Test. The Rorschach Examination indicated the defendant had contact with reality and there were indications of a potential for above average creativity and intelligence.
Sonnier's criminal record reveals five arrests as a juvenile: disturbance (no disposition); simple burglary and simple criminal damage (indefinite period of supervised probation); simple burglary (continued probation until April 24, 1967); fight (released); juvenile trouble (released). His adult record includes an attempted theft of a boat for which he was released. He was convicted on two counts of auto theft in 1968 and sentenced to four and three years at hard labor. (The sentences ran concurrently.) He was paroled in 1970. On July 7, 1970, he was arrested on a charge of theft by false pretenses but the case was dismissed. In November of 1970, he was arrested and charged with the theft of a shotgun and a television which resulted in his parole being revoked. During the period he was on parole, he was in trouble for non-support, and changing jobs and residences. Defendant served out his term at Angola and was discharged on March 10, 1972.
Defendant worked in the oil fields until 1975, except for the period he was at Angola. He worked on a hog farm in Texas for one year and returned to Louisiana in 1976. He was then employed by Hub Security until September of 1976 when he was fired because he had falsified his application for employment and his employer suspected he had stolen some money from a client. The defendant then took a job with B & B Security Police until March of 1977 when he began working for Jo-Dee Equipment Rental where he was employed at the time of his arrest. He was regarded by Jo-Dee as a reliable employee.
There have only been three other first degree murder prosecutions in Iberia Parish since January 1, 1976. James Lee Bullock, indicted for first degree murder, was found guilty of second degree murder and sentenced to life in prison. Bullock, described as a relatively small individual (weighing 125-140 pounds) beat an oil field worker (who weighed over 200 pounds) with a billy club with such force that it broke the club into several pieces. The incident occurred when the two men got into an altercation after the automobile in which they were riding with two other persons broke down in a desolate area of Iberia Parish. Bullock struck the victim repeatedly until the club shattered. He then relieved the victim of his wallet and told him to leave the area. As the victim attempted to do so, the defendant gouged him with a part of the broken club. The victim's body was found three days later. He died of a cerebral hemorrhage as a result of blows inflicted to the head. Bullock was twenty-three years of age at the time of the crime.
Frank Bennett was charged with the first degree murder of Leona Bartley on May 16, 1977, found guilty and sentenced to life imprisonment on the recommendation of the jury. The defendant had an argument with a member of the residence where he was living. As a result he was put out of the house and had to sleep in a washateria. The next day he went to a store and bought a handgun. He went to the residence and began firing the gun into the air and then went inside and beat the victim with the gun. As the victim ran outside to escape his attack, the defendant fired several shots at the victim, one of which hit the victim and killed her instantly. The defendant told police he went up to the victim to be sure she was dead. He said that if she had not been, he would have shot her again. The defendant also told the police that he was happy he had killed the victim. The defense called witnesses that day who testified the defendant "looked wild" on the day of the murder. Defense counsel argued in way of mitigation that the offense was committed while the offender was under the influence of extreme mental or emotional disturbance.
The only other first degree murder prosecution in the Sixteenth Judicial District *1364 since January 1, 1976, is that of Eddie James Sonnier, the brother of the defendant. Sonnier was convicted of two counts of first degree murder of David LeBlanc and Loretta Bourque and sentenced to death. His appeal is scheduled to be argued before this Court next term.
We do not believe either the Bullock or the Bennett convictions bear any similarity to the instant case. Both killings in those cases occurred after altercations between the victims and the defendants. Further, in Bennett, there was evidence that the defendant's conduct was influenced by an extreme mental or emotional disturbance. We are, therefore, unable to say that the sentence is disproportionate to the penalty in similar cases, considering both the crime and the defendant.

Conclusion
Having found no evidence which suggests that the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and further having found sufficient evidence from which the jury could rightfully have concluded one or more statutory aggravating circumstances existed in this case, and finally having found the sentence is not disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, we conclude that the sentence of death is not excessive in the instant case.

DECREE
For the above and foregoing reasons, the conviction and sentence of the defendant are affirmed.
AFFIRMED.
DENNIS, Justice, concurring in part and dissenting in part.
I concur in the majority's affirmance of the defendant's conviction, but I respectfully dissent from its refusal to set aside the death penalty and order a new capital sentence hearing. Although the majority opinion fails to articulate standards of review for errors of fact and law in a capital sentence proceeding, it is evident that the standards applied by the majority in the instant case fall short of the minimum criteria necessary to assure due process of law in the imposition of the death penalty.
The penalty of death is qualitatively different from any other sentence. Because of that qualitative difference, a correspondingly greater need for reliability is called for in the determination that death is the appropriate punishment in a specific case. Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).
In applying the Louisiana "harmless error" rule, this Court has consistently held that in doubtful cases the doubt as to the prejudicial effect of the trial judge's error is resolved in favor of the accused. See La.C.Cr.P. art. 921, Official Revision Comment (c). In view of this standard, and the need for even greater reliability in capital cases, see Lockett v. Ohio, supra; Gardner v. Florida, supra; and Woodson v. North Carolina, supra, this Court cannot approve a death penalty in the face of an error in a capital sentencing hearing, unless it is convinced beyond a reasonable doubt that the mistake was inconsequential to the jury's recommendation. See also, Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.").
The Due Process Clause and Article 1, § 2 of the 1974 Louisiana Constitution protect every accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged. In Re Winship, 397 U.S. 358, 90 *1365 S.Ct. 1068, 25 L.Ed.2d 368 (1970); State v. Searle, 339 So.2d 1194 (La.1976). It may be argued that in determining the sentence in capital cases an even more stringent instrument for reducing the risk of executions resting on factual error is needed. See Lockett v. Ohio, supra; Gardner v. Florida, supra; Woodson v. North Carolina, supra.
However, it is clear that a jury finding of an aggravating circumstance, as a matter of constitutional and statutory law, see La. C.Cr.P. art. 905.3, must be founded at least upon proof beyond a reasonable doubt. Furthermore, the critical inquiry in this Court's review of a capital sentence must be not simply to determine whether the jury was properly instructed on reasonable doubt, but to determine whether the record evidence can reasonably support a finding of an aggravating circumstance beyond a reasonable doubt. Cf. Jackson v. Virginia, ___ U.S. ___, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
A reading of the majority opinion reveals that this Court has adopted standards of review that are inadequate to protect against misapplications of the constitutional standard of reasonable doubt and against influence of the jury's recommendation by error or other arbitrary factors. For the Court's decision leaves unrectified an erroneous instruction by the trial judge and other errors of law which more than likely influenced the jury's recommendation; as well as findings of fact which are not supported by the evidence beyond a reasonable doubt.
After the jury had been deliberating upon the sentence for some time it requested additional instructions on whether the defendant would be eligible for work release programs if he were sentenced to life imprisonment. The trial judge read La.R.S. 15:1111(A) and (B)[1] to the jury. The statute authorizes the Department of Corrections to establish rules for determining those inmates who may participate in work release programs. However, the trial judge told the jury that he did not have a copy of the regulations. Accordingly, the jury probably gathered that if it did not recommend that Sonnier be sentenced to death, he would receive a sentence of life imprisonment and possibly be eligible for work release programs in universities, colleges, vocational schools, sheltered workshops and other places. Shortly after receiving this instruction the jury returned and made its unanimous recommendation that the death sentence be imposed upon the defendant.
The trial judge's instruction was incomplete and misleading. At the time of Sonnier's trial the Department of Corrections' regulations provided that inmates convicted of murder in any degree, attempted murder or murder reduced to manslaughter as a result of a plea bargain, were not eligible for maintenance and work release programs. Department Regulation No. 30-14, State of Louisiana Department of Corrections (February 9, 1978). A few months after his trial La.R.S. 15:1111 was amended by Act No. 510 of 1978 so as, in effect, to *1366 prohibit first degree murderers from participating in any work release programs.[2]
The judge clearly erred in giving an incomplete instruction which implied that Sonnier would be eligible for work release in universities, colleges and other public places.[3] Since more than a reasonable doubt exists, in light of the events that transpired at the sentencing hearing, as to whether the jury was influenced by the error in recommending that Sonnier be sentenced to death, it is this Court's duty to set right the error by vacating the capital penalty and requiring a new sentencing hearing. See La.C.Cr.P. art. 905.1.
The opinion of the majority of this Court does not squarely confront the issue. It concedes that an error was committed, but obliquely indicates that the error was not prejudicial to the defendant's right to a fair trial without stating the standard of review which has been applied.
Although it is clear that the trial judge's misleading instruction requires reversal and retrial of the sentencing portion of defendant's case, it should be noted that this case points up a problem of constitutional dimensions with which we soon may be confronted. If jurors demonstrate a willingness to recommend the death penalty in certain cases merely because they lack confidence in the ability of the legal and correctional systems to protect society from a violent criminal, does not fairness and due process demand that the state remedy the deficiency in its laws or its corrections programs rather than put to death the defendants in those cases? Is it not unjust, unfair, cruel and excessive punishment to allow a defendant to be electrocuted when a jury does not think that the death penalty is truly appropriate but feels compelled to recommend it because it does not have faith in the state's ability to carry out a true life sentence? It seems evident that the use of capital punishment merely for the purpose of removing dangerous persons from society is excessive because this objective can be accomplished by imprisonment; and if a jury is moved to recommend the death penalty solely for this reason in a particular case the sentence should be set aside. The infinitely more difficult questions, however, are whether there is such a widespread lack of confidence in our laws and corrections programs as might impel juries generally to vote for the death penalty for no reason other than to remove violent criminals permanently from society; and, if so, whether the deficiencies in the legal and correctional systems are susceptible to correction.
In Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), the Supreme Court held a punishment to be excessive and violative of the cruel and unusual punishment clause "if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime." Id. 592, 97 S.Ct. 2865. In a case in which the death penalty would not have been imposed but for the jury's fear that the defendant cannot be incarcerated for life, it would appear that the punishment would be cruel and unusual under either clause. In the first place, if one focuses upon the goal of retribution, the proportionality standard *1367 and the first standard coalesce to bar the death penalty because the punishment is disproportionate to a crime if its sanctions are more severe than the criminal deserves. Because retributivists argue that the only acceptable justification of punishment is that criminals deserve it, punishing disproportionately would serve no acceptable goal of punishment. On the other hand, if one focuses upon the utilitarian aspects of punishment, the death penalty in such a case is cruel and unusual because it makes no measurable contribution to acceptable goals of punishment over and above that which might be accomplished by a true life sentence. Cf. Radin, The Jurisprudence of Death: Evolving Standards for the Cruel and Unusual Punishments Clause, 126 U. of Pa.L.Rev. 989, 1053 (1978).
In addition to the foregoing the majority committed several errors in reviewing the jury's findings of aggravating circumstances.
First, the majority erred in giving overly broad interpretations to the statutory categories of aggravating circumstances: "The offender knowingly created a risk of death or great bodily harm to more than one person," La.C.Cr.P. art. 905.4(d)a phrase clearly intended to cover the knowing creation of risk of multiple deaths by one act such as shooting into a church congregation or exploding a bomb in an inhabited building; "[t]he offense was committed in an especially heinous, atrocious or cruel manner," La.C.Cr.P. art. 905.4(g)a provision directed only at the conscienceless or pitiless crime which is unnecessarily tortuous to the victim. Today the Court adopts constructions expanding these categories to include any murder in which the victim witnesses the homicide of another and has foreknowledge of his own murder; and any murder which is part of a course of conduct designed to do away with witnesses to a homicide, even though the crimes may be widely separated in time and location. The majority's interpretationswhich make every multiple murder fall within one or both categoriesunreasonably expand the capital categories beyond the legislature's intention; and the statutory construction casts doubt upon the constitutionality of Louisiana's entire capital punishment scheme. See Gregg v. Georgia, 428 U.S. 153, 201, 202, 96 S.Ct. 2909, 2938, 2939, 49 L.Ed.2d 859, 890, 891 (1976); Proffitt v. Florida, 428 U.S. 242, 255, 256, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913, 924 (1976).
Second, the majority evidently employed the "some evidence" rule or another standard of review which is constitutionally inadequate to protect against misapplications of the criterion of reasonable doubt. The Supreme Court in Jackson v. Virginia, supra, specifically disapproved of use of a similar rule, the "no evidence" rule, for this purpose and held in a challenge to a state criminal conviction by federal habeas corpus that the proper inquiry on review is whether the record evidence reasonably supports a finding of guilt beyond a reasonable doubt. Due process of law and the need for the "greater degree of reliability" when the death penalty is imposed demand that a standard at least this stringent be employed in our review of capital sentences. The majority opinion is devoid of any determination that a rational trier of fact could have found the aggravating circumstances beyond a reasonable doubt. Had this Court applied the minimum standard essential to due process it would have concluded that the evidence was insufficient to support the findings of several of the aggravating circumstances listed by the jury.
Third, the majority erred by basing its opinion on the premise that the death penalty must be upheld if the jury correctly found "one or more" aggravating circumstances to exist. Apparently the majority sees the role of this Court in capital sentence review as a limited one of determining if there is at least one correctly found aggravating circumstance. This view is clearly in conflict with the Supreme Court's decisions in Gregg and its companion cases, Jackson v. Virginia, supra, Article 1, § 20 of *1368 the 1974 Louisiana Constitution, and La.C. Cr.P. art. 905 et seq. Under the principles set forth therein this Court is charged with the responsibility of reviewing the jury's recommendation to determine whether the sentence was influenced by passion, prejudice or any arbitrary factor; and whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; as well as whether the evidence reasonably supports each finding that an aggravating circumstance exists beyond a reasonable doubt. See also, Roberts v. Louisiana, 428 U.S. 325, 335, 96 S.Ct. 3001, 3007, 49 L.Ed.2d 974, n. 11 (1976).
A sentence of death may be excessive or influenced by passion, error or other arbitrary factor even though each finding of aggravating circumstance is constitutionally supported by the evidence. In such a case this Court is obliged to set the sentence aside and order a new hearing. A sentence of death may be based upon several findings of aggravating circumstances, one or more of which the record evidence does not reasonably support beyond a reasonable doubt. In this event it is our clear duty to order a rehearing with respect to the sentence, unless we can determine beyond a reasonable doubt that the jury would have recommended death independently of its erroneous finding. Since the responsibility of making the affirmative determination that the death penalty is "appropriate" in a given case is assigned exclusively to the jury, see La.C.Cr.P. art. 905.6, this Court cannot make such a determination on appeal. Essentially, this Court may only pass on whether the penalty is excessive, supported by the evidence, or influenced by passion, prejudice, error or other arbitrary factor. Therefore, this Court cannot lightly disregard the possibility that a jury recommendation has been influenced by an erroneous finding of an aggravating circumstance or assume that the jury would have made the same recommendation despite the error.
By failing to articulate and apply standards of review which meet the minimum criteria essential to due process and provide the "greater degree of reliability" called for when the death sentence is imposed, the majority of this Court has not only perpetuated injustice in the instant case, it has embarked upon a course which, if not corrected, can only result in the arbitrary and capricious infliction of death penalties which led the United States Supreme Court to invalidate the prior capital punishment statutes in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

ON REHEARING
CALOGERO, Justice.[*]
Elmo Patrick Sonnier was convicted of two counts of first degree murder. In accordance with the jury's recommendation, the trial court imposed the death penalty for each of the two counts. Upon appeal we affirmed defendant's convictions and sentences. Upon application of the defendant we granted a rehearing to reconsider whether an instruction to the jury during the capital sentencing hearing portion of the bifurcated trial was erroneous or so misleading as to taint the jury's recommendation of the death penalty.
During the sentencing portion of the trial, the state presented no new evidence and the defense called no witnesses. Only the stipulated testimony of Nathan Lubin, a psychologist was introduced by the defense. Within one hour after the jury had retired for deliberation, it presented three questions to the trial judge, the last of which was whether someone sentenced to life imprisonment without benefit of parole, probation or suspension of sentence was eligible for pardon by the governor or for participation in work release programs. Before replying to any of the questions, the trial judge submitted his proposed answers *1369 to both the defense and the state. Neither the defense nor the state voiced any objection to his proposed answers.
The jury was then informed that the governor could exercise his power of pardon irrespective of the sentence imposed upon the defendant. With this instruction, there is no argument. With regard to the defendant's eligibility for work release, the trial judge read R.S. 15:1111(A) and (B).[1] That statute authorizes the Department of Corrections to establish rules governing work release programs which may include placement in "universities, colleges, technical, vocational or trade schools or in sheltered workshops or in training programs designed to improve the skills and abilities of the inmate." The judge further instructed the jury that he did not have a copy of the Department of Corrections' regulations.
There is no contention in this case that the instruction read to the jury was an incorrect statement of the law. The statute was fully and correctly read to the jury. The pertinent question, however, is whether the instruction on work release programs in response to the jury's inquiry was so incomplete as to be misleading.
To the jury's question as to whether a person sentenced to life without benefit of parole, probation or suspension of sentence is eligible for participation in a work release, the judge by reading R.S. 15:1111(A) and (B) replied simply that the law authorizes the Louisiana Department of Corrections to establish and administer a work release program for inmates of any institution under its jurisdiction and to establish rules (concededly not then available to the trial judge) for the administration of the program and determination of those inmates who may participate in the program (with the possibility of placement in universities, colleges, technical, vocational or trade schools, etc.). If the judge had reviewed the regulations of the Department of Corrections, the jury would have been informed that any inmate convicted of "murder in any degree, attempted murder, or murder reduced to manslaughter as a result of a plea bargain" was ineligible for participation in work release programs. See Department of Corrections Regulation No. 30-14, dated February 9, 1978. The reading of the statute alone, without the Department of Corrections' regulations, left the jurors free to speculate whether the defendant might be returned to society, perhaps almost as soon as he was imprisoned.
Although given an opportunity to read the trial court's proposed response to the inquiry before it was read to the jury, defense counsel offered no objection to the charge. The failure to object to an erroneous charge would under Article 841 waive *1370 the error in the ordinary case.[2] And although procedural rules have sometimes been relaxed in capital cases,[3] this Court has never explicitly held that an irregularity or error not preserved by objection at trial may be considered on appeal. We need not here expressly hold that errors in a capital case or a capital sentencing hearing are reviewable notwithstanding a failure to object, for there is an independent basis for this Court's reviewing the entire proceedings in a capital sentence hearing.
The present statutory scheme in Louisiana for imposition of the death penalty was enacted after the United States Supreme Court held in Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976) that the Louisiana legislation providing for the death penalty failed to provide a constitutionally adequate response to that Court's decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Furman rejected unbridled jury discretion in the imposition of capital sentences. On the same day that Roberts was rendered, the Supreme Court in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 approved a Georgia statutory scheme finding that it provided safeguards so that the death penalty could not be imposed in an arbitrary or capricious manner. Apparently in an attempt to enact a constitutionally acceptable statutory scheme for the imposition of the death penalty, the Louisiana legislature modeled our present statutes after those approved in Gregg.
One of the safeguards of the Georgia statutes incorporated into our law is the automatic appellate review of every death sentence. So, under Article 905.9 of the Code of Criminal Procedure this Court is required to review every sentence of death for excessiveness. That article also mandates this Court to "establish such procedures as are necessary to satisfy constitutional criteria for review." Pursuant to this authorization, we have adopted Supreme Court Rule 28, § 1 which establishes the following review guidelines:
"Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
These sentence review guidelines are the same as those authorized by the Georgia statute and approved by the United States Supreme Court in Gregg.
By requiring this Court to review every sentence to determine whether it is excessive *1371 and mandating that this Court establish guidelines for review that satisfy constitutional criteria, the legislature has provided a system of review to insure against the arbitrary or random imposition of the death penalty.
Under the review guidelines provided by Section 1 of Supreme Court Rule 28, this Court is charged with the responsibility of reviewing the jury's recommendation to determine whether the sentence was influenced by passion, prejudice or any arbitrary factor. The Court must consequently conduct an independent review, regardless of the failure of defense counsel to object to possible error, to determine whether any of these factors contributed to the jury's recommendation of the death penalty.[4]
In the instant case it is clear that the trial court's incomplete response and misleading instruction contributed to the jury's recommendation. The jury was read a statute from which it could infer that the defendant, if sentenced to life imprisonment without benefit of parole, probation or suspension of sentence, would be eligible for participation in a work-release program. Shortly after the instruction, the jury returned with the recommendation that defendant be sentenced to death. Had the jury been read the Department of Corrections regulations, it would have known that defendant would not have been eligible for the work release program. In that event the jury would have been better able to focus on the defendant, his crime, and the aggravating and mitigating circumstances rather than an erroneous assumption concerning defendant's possible release.
The only evidence presented in the sentencing portion of the trial was the stipulated testimony of Dr. Nathan Lubin, a psychologist. That testimony stressed the automatic sort of aggression upon which the defendant relied as a psychological defense mechanism, concluding that the defendant "is quite capable of irrational and aggressive behavior ... [and should] be placed in a residential hospital setting in order to avoid the possibility of his aggressive and dangerous behavior." While attempting to establish the mitigating factor of diminished responsibility or capacity, defense counsel through this testimony informed the jury that if defendant were placed in a similar situation, there was a probability that another act of violence or even murder would occur. If the jury had been informed that defendant if sentenced to life imprisonment would remain in prison indefinitely, without eligibility to participate in a work release program, at least under the current regulations of the Department of Corrections, Dr. Lubin's testimony might have had a positive effect upon the jury. However, if the jury thought that defendant might be placed in a work release program, that very same testimony could only have been to defendant's detriment.
The jurors' concern that defendant might be returned to society was evident in their request for instruction on the governor's power to pardon and defendant's possibility of participating in a work release program. The fear that defendant might return to society through work-release which was induced by the trial court's incomplete response and misleading instruction is in our view an "arbitrary factor" contributing to *1372 jury's recommendation of the death penalty.[5]
Article 905.1(B) of the Code of Criminal Procedure provides that if this Court finds an error in the sentencing hearing which necessitates a remand and a new trial, the trial court shall be empowered to empanel a new jury for the determination of the issue of penalty.[6] Because we have found no error in the guilt determination portion of defendant's trial, defendant's conviction will be affirmed. However, because we have found that the defendant's death sentence was imposed under the influence of an arbitrary factor, the sentence must be vacated and the case remanded to the district court for the empanelling of a new jury for determining only the issue of penalty in accordance with Article 905.1.

Decree
Accordingly, the opinion of this Court on original hearing is reinstated insofar as it affirmed defendant's conviction; but defendant's sentence is vacated and the case remanded to the district court for the empanelling of a new jury for determining anew only the issue of penalty in accordance with the procedure set out in Article 905.1(B).
CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED FOR NEW TRIAL ON PENALTY ISSUE ONLY.
SUMMERS, C. J., dissents.
MARCUS, J., concurs in part and dissents in part and assigns reasons.
BLANCHE, J., dissents and assigns reasons.
MARCUS, Justice (concurring in part and dissenting in part).
As the majority correctly states: "There is no contention in this case that the instruction read to the jury was an incorrect statement of law." In my view, to have required the trial judge to extend his instruction to include the regulations of the Department of Corrections is beyond that which is required by law. Accordingly, I would affirm the conviction and sentence and reinstate this court's opinion on original hearing. Hence, I respectfully concur in part and dissent in part.
BLANCHE, Justice (dissenting).
The majority opinion holds that had the jurors been aware of the Department of Corrections' rules and regulations prohibiting work release of prisoners convicted of first degree murder, they would not have been free to speculate whether defendant might be returned to society, perhaps almost as soon as he was imprisoned. Of course, the same speculation was not indulged in concerning the Governor's authority to pardon, although he too could have released the defendant almost as soon as he was imprisoned.
The jury was exhaustively and properly instructed at the sentencing hearing and were they to engage in such speculation, it would amount to a violation of their oaths.
I respectfully dissent.
NOTES
[1] In Bell, this Court also set forth the following factors which are relevant in determining whether a change of venue should be granted:

"... (1) [T]he nature of pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire...." (315 So.2d at 311)
[2] Defendant also introduced six articles from the Teche News, a weekly publication with a circulation of only ninety in Iberia Parish. Since the victims were from St. Martin Parish and since the paper was a weekly, the articles tended to be longer than those in the Iberian. That paper also carried a picture of the defendants on the front page which was not printed in the Iberian at all. Since the circulation of the Teche News is so small in Iberia Parish, the court did not really consider it as a factor.
[3] Several of the witnesses initially testified that they had formulated an opinion. However, after being questioned by the court or by the District Attorney on cross-examination regarding the presumption of innocence, reasonable doubt and the duty to decide the case solely on the evidence presented in court, they stated they would be able to put aside their previous feelings and follow the instructions of the court.
[4] Justice Barham, concurring in State v. St. Andre, 263 La. 48, 267 So.2d 190 (1972), and dissenting in State v. Williams, 263 La. 755, 269 So.2d 232 (1972), argued that the State is required to file separate indictments whenever jointly indicted defendants are tried separately. However, a majority of this Court has not adopted that position.
[5] Mrs. Berard also stated that another brother who was unemployed may have at one time been a special deputy but she was not sure.
[6] A small town in Evangeline Parish.
[7] The defense abandoned this argument in brief to this Court. LSA-R.S. 15:450 requires that a confession be used in its entirety. This Court has held that when a statement refers to other crimes, a defendant has the option of having only that portion of the statement which pertains to the instant offense submitted as evidence or having the whole statement introduced. Defendant cannot have the entire confession suppressed if it is otherwise admissible. See State v. Snedecor, 294 So.2d 207 (La. 1974).
[1] At the time of Sonnier's trial La.R.S. 15:1111, in pertinent part, provided:

"A. The Louisiana Department of Institutions is hereby authorized to establish and administer a work release program for inmates of any institution under the jurisdiction of the department.
"B. The department shall establish rules for the administration of the work release program and shall determine those inmates who may participate in the release program. Notwithstanding any provision of law to the contrary, any convict sentenced to imprisonment at hard labor shall be eligible at any time during his sentence to participate in the work release program, subject to the provisions of this Part. If any inmate violates the conditions prescribed by the department, his work release privileges may be withdrawn. Failure to report to or return from the planned employment shall be considered an escape under the provisions of R.S. 14:110. The department may approve as work release privileges, placement in universities, colleges, technical, vocational or trade schools or in sheltered workshops or in training programs designed to improve the skills and abilities of the inmate.
"* * *."
[2] La.R.S. 15:1111, as amended, provides that an inmate who has been convicted of first degree murder "shall be prohibited from participation in the work release program except during the last six months of his term." Since a sentence of life imprisonment without benefit of parole, probation, or suspension of sentence expires with the life of the inmate, work release is prohibited until six months before the death of such an inmate, an event not susceptible to accurate prediction.
[3] The trial judge's instructions were disturbingly opaque on the subject of whether the jury Must recommend the death penalty if it finds an aggravating circumstance to exist. It would seem highly desirable, if not essential, that the trial judge depart from the statutory language to make it abundantly clear that "[h]aving found an aggravating circumstance, however, the jury is not required to impose the death penalty." State v. Payton, 361 So.2d 866, 868 (La.1978).
[*] Honorable Jesse N. Stone, Jr. served as Associate Justice Ad Hoc in the vacancy created by the resignation of Tate, J.
[1] At the time of defendant's trial R.S. 15:1111, in pertinent part, provided:

"A. The Louisiana Department of Institutions
[Department of Corrections, See R.S. 15:838] is hereby authorized to establish and administer a work release program for inmates of any institution under the jurisdiction of the department.
"B. The department shall establish rules for the administration of the work release program and shall determine those inmates who may participate in the release program. Notwithstanding any provision of law to the contrary, any convict sentenced to imprisonment at hard labor shall be eligible at any time during his sentence to participate in the work release program, subject to the provisions of this Part. If any inmate violates the conditions prescribed by the Department, his work release privileges may be withdrawn. Failure to report to or return from the planned employment shall be considered an escape under the provisions of R.S. 14:110. The department may approve as work release privileges, placement in universities, colleges, technical, vocational or trade schools or in sheltered workshops or in training programs designed to improve the skills and abilities of the inmate." Acts of 1970, No. 444.
Act 510 of 1978, effective after the trial date, amended this section and others to provide, Inter alia, that no inmate convicted of first degree murder would be considered for a work release program before the last six months of his sentence. As the termination of a life sentence is not susceptible to calculation, the governor's commutation of the sentence to a term of years would be necessary before work release could become a possibility for someone convicted of murder.
[2] Article 841 of the Code of Criminal Procedure provides:

"An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
"The requirement of an objection shall not apply to the court's ruling on any written motion."
[3] Before its amendment by Act 207 of 1974, Code of Criminal Procedure Article 844 required for an error to be reviewable on appeal that bills of exception be signed by the trial judge prior to the order granting an appeal. Recognizing that a technicality should not deprive a defendant sentenced to death of review of the trial court's proceedings, the legislature amended Article 844 to provide that in death cases the appellate court "to promote the ends of justice" may consider bills that are not timely signed. See Official Revision Comments to Article 844.

Additionally this Court in State v. Jones, 332 So.2d 466 (La.1976) held that although assignments not briefed or argued are considered abandoned, in a death case, the court nevertheless will review the errors.
[4] In Prevatte v. State, 233 Ga. 929, 214 S.E.2d 365 (1975) the Georgia Supreme Court relying on the death penalty review procedure later approved in Gregg v. Georgia, supra, and subsequently adopted by the Louisiana legislature, vacated a jury's recommendation of the death sentence when it found that an unobjected to argument by a district attorney may have influenced the jury to impose a more severe sentence than unbiased judgment would have given. That court relied upon the mandate of the death penalty procedure requiring the court to determine "whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor" to review the error despite defense counsel's failure to object.
[5] We so conclude without regard to defendant's contention that at least one juror was holding out for a sentence of life imprisonment until he learned that defendant would be entitled to work release, evidence of which defendant was unable to present because of the rule prohibiting jurors from impeaching their own verdicts. R.S. 15:470.
[6] Article 905.1(B) provides:

"If an error occurs only during the sentencing hearing which would necessitate the declaration of a mistrial, or the granting of a new trial by the trial court, or if an appellate court finds an error that occurred only in the sentencing hearing which would necessitate a remand and a new trial, then the trial court shall be empowered to empanel a new jury under the same procedure set out in Title XXVI, Chapter 3 of the Louisiana Code of Criminal Procedure for determining only the issue of penalty, and the rule of sequestration shall apply to the new jury so empanelled."